## CROSLEY CORPORATION v. WESTINGHOUSE ELECTRIC & MFG. CO.

### No. 1524.

District Court, W. D. Pennsylvania.

Nov. 30, 1943.

As Corrected Jan. 25, 1944.

886

See, also, 43 F.Supp. 690; 130 F.2d 474.

Samuel E. Darby, Jr. and Floyd H. Crews, both of New York City, Alden D. Redfield, of Cincinnati, Ohio, and Christy, Parmelee & Strickland, of Pittsburgh, Pa., for plaintiff.

Brown, Critchlow & Flick and Jo. Baily Brown, all of Pittsburgh, Pa., Victor S. Beam, of New York City, Carl S. Lloyd, of Chicago, Ill., and W. Melville Van Sciver, of Lester, Pa., for defendant.

GIBSON, District Judge.

The court, after hearing and consideration, makes the following findings of fact and conclusions of law:

### Findings of Fact
### General

1. This suit involves eighteen patents, relating to electric refrigeration, which are owned by the defendant-counterclaimant, Westinghouse Electric and Manufacturing Company, a corporation of the State of Pennsylvania (hereinafter referred to as "defendant", or as "Westinghouse"). Defendant has been the owner of all of said patents since they were issued.

2. The plaintiff, the Crosley Corporation, a corporation of the State of Ohio (hereinafter referred to as "plaintiff" or as "Crosley"), was notified by defendant, prior to commencement of this suit, of alleged infringement of each of said patents, except Quimper patent 2,254,780 and Forsthoefel patent 2,254,604, which had not been issued when the complaint herein was filed.

3. The present suit was brought under the Declaratory Judgment Act (Sec. 274d, Judicial Code Title 28 U.S.C.A. § 400) praying that each of said patents, except the two above identified, be declared invalid and/or not infringed. The suit was filed the day after receipt by Crosley of notice from Westinghouse that it was about to bring suit against Crosley for infringement of said patents, which was done (in the Southern District of Ohio) the day after, and without knowledge of, the filing of the present suit.

4. The defendant counterclaimed herein for alleged infringement by plaintiff of all the patents included in the declaratory judgment action and also of said Quimper patent 2,254,780 and said Forsthoefel patent 2,254,604, which had issued between the filing of the complaint and the filing of the counterclaim. An additional infringement suit had been filed against Crosley on the latter patents in Ohio some time before the counterclaim was filed, but Crosley did not amend its complaint herein to include said patents.

5. Westinghouse entered the household refrigerator field in 1930, its refrigerators from the beginning being of the hermetically sealed type, which is the type involved in this litigation. Crosley entered the refrigerator field about 1931 with a so-called "open-type" refrigerator, not here involved, and began making the hermetically sealed type

in 1935. Crosley refrigerator Models S–641 and SE–641, which were offered as proof of the alleged infringement of many of the patents in suit, were manufactured and sold by Crosley beginning with its 1941 models.

6. Westinghouse relies upon the following claims of the respective patents with respect to the noted Crosley models:

| Patents | Claims | Model |
|---|---|---|
| Forsthoefel 2,166,630 | 7 & 8 | S–641 & SE–641 |
| Yoxsimer 2,242,335 | 3 | " " |
| Quimper 2,254,780 | 1, 2 & 6 | " " |
| Anderson Reissue 21,535 | 1 to 4, incl. | " " |
| Forsthoefel Reissue 21,178 | 1 & 3 | SE–641 |
| Yoxsimer 2,194,176 | 1, 3, 4 & 5 | SE–641 |
| Kruck Design 112,778 | | S–641 & SE–641 |
| Ford 1,967,770 | 1 to 4, incl. | " " |
| Ashbaugh 2,079,238 | 2, 3, 4, 8 & 9, 11 & 12 | " " |
| Roberts 2,188,303 | 1, 4 & 5 | " " |
| Terry 2,007,730 | 1 to 4, incl. | " " |
| Kucher 1,719,807 | 9, 10, 15, 16, 17, 18, 22, 23, 24 & 25 | " " |
| Kucher 1,719,820 | 12, 13 & 14 | " " |
| Kucher Reissue 19,908 | 44, 45 & 47 | " " |
| Terry 2,040,507 | 7, 8 & 10 | " " |
| McCloy 2,181,856 | 1 to 18, incl. | " " |

7. The plaintiff was notified of infringement of the following additional claims of said patents which were not relied upon at the trial:

| Patents | Claims |
|---|---|
| Forsthoefel Reissue 21,178 | 2 & 4 |
| Yoxsimer 2,194,176 | 2 |
| Ashbaugh 2,079,238 | 6 & 14 |
| Roberts 2,188,303 | 2, 3 & 6 |
| Kucher 1,719,820 | 4, 5 & 6 |

8. Also White reissue patent 21,864 and Forsthoefel patent 2,254,604 were sued upon in the counterclaim but were withdrawn from suit by defendant, the former prior to the trial and the latter after conclusion of plaintiff's prima facie case.

9. Plaintiff and defendant both began manufacturing electrical household refrigerators about 1930 or 1931. Such refrigerators had been manufactured and sold in large numbers many years prior thereto. As early as 1919 there were thousands of household electric refrigerators in use in the United States.

10. Westinghouse intermittently charged Crosley with infringement of one or more of its patents by reason of Crosley's manufacture and sale of household refrigerators for a period of seven years prior to the commencement of the present suit.

11. The Stipulation of Facts filed by the parties hereto is now referred to and made part hereof.

Forsthoefel Patent No. 2,166,630

*Findings of Fact:*

1. The Forsthoefel Patent 2,166,630, Claims 7 and 8 of which are in suit, relates to a refrigerator cabinet construction and particularly to an improved structure for mounting a heat breaker strip (which minimizes heat flow) between the inner and outer wall members of the cabinet and for retaining it in proper relationship to such wall members.

2. The invention defined in the claims of said patent which are in suit is in the combination of the heat breaker strip, a two-way spring construction and the cabinet elements which cooperate therewith, and not in the breaker strip alone. Therefore the claims are not for an exhausted combination, as alleged by the plaintiff.

3. Claim 8 of said patent, which is alleged by plaintiff to be invalid for indefiniteness because of the definition of certain elements thereof by the term "means", uses this term, followed by a statement of function, in describing two of the several structural elements of the combination, and does not use it followed by a statement of the result of the invention. The term "means", as here used, is common in patent claims and does not make the claim in question indefinite.

4. All the essential features of the Forsthoefel invention were fully disclosed in the

original application for the patent in suit and were supported by oath of the inventor. No "new matter" was introduced during the prosecution of the Forsthoefel application, such changes as were made being fully consistent with the original application and oath as filed in the Patent Office.

5. The subject matter disclosed in the specification and drawings and covered by the claims of said Forsthoefel patent required for its production the exercise of inventive skill.

6. The subject matter of said Forsthoefel patent as set out in the claims in suit is not anticipated by the prior art relied upon by plaintiff.

7. The claims of the said patent disclose a new and useful discovery by Forsthoefel, and each of the claims in suit is infringed by the construction employed by the plaintiff in its refrigerator Models S-641 and SE-641. The members on the cabinet walls which are in contact with the breaker strip in the Crosley structure are, in effect, parts of the wall members and thus literally respond to the terms of the claims in suit; also they are the equivalent in structure and function to the corresponding members shown in the patent, although the latter are integral with the wall members.

8. The invention of said Forsthoefel patent has never been employed as a whole in any refrigerator manufactured and sold. The Philco Corporation is a licensee under the patent.

*Conclusion of Law:*

Plaintiff's refrigerators S-641 and SE-641 infringe the patent claims in suit.

## Yoxsimer Patent No. 2,242,335

*Findings of Fact:*

1. The Yoxsimer patent 2,242,335, claim 3 of which is in suit, relates to a refrigerator cabinet construction in which the heat breaker strip is retained in position with respect to the inner and outer walls or shells of the cabinet by a groove or pocket associated with one shell and a preformed s-shaped strip which may be slid onto a flange of the other shell, with widely spaced apart members for holding the shells in spaced relation and minimizing the flow of heat from one of said shells to the other through said members.

2. The invention defined in said claim is in the combination of the elements set forth therein, which cooperate with each other to accomplish the objects stated in the patent, and is not in one element only of the combination. Therefore the claim is not for an exhausted combination. Nor is it aggregational by reason of the inclusion therein of the heat insulation, because the latter is an essential part of the wall structure and cooperates with the other elements to minimize the flow of heat from the outer shell to the inner shell.

3. The claim is supported by the disclosure of the patent since the "widely spaced apart members adjacent the heat breaker," etc., which element is questioned by plaintiff, are shown and described in the drawings and specification, these being the members 33 shown in Fig. 1 of the drawings and described in lines 46–50 on page 1 of the specification.

4. The claim in suit of said Yoxsimer patent is sufficiently definite, since the word "substantially" (one of the expressions questioned by the plaintiff) is commonly used in patent claims to prevent avoidance of literal infringement by minor changes, and the meaning of the words "widely" and "minimize" (the other questioned expressions) is clear from the context and the disclosure on which they are based.

5. Said claim of the Yoxsimer patent distinguishes from the claims of Forsthoefel patent 2,205,780 by inclusion of material elements which are not in the latter claims and hence there is no double patenting as between these two patents.

6. The subject matter disclosed in the specification and drawings and covered by the claim in suit of said Yoxsimer patent required for its production the exercise of inventive skill.

7. The cabinet construction defined in said claim 3 of said Yoxsimer patent is not anticipated by the prior art relied upon by the plaintiff.

8. Said claim discloses a new and useful discovery by Yoxsimer and is infringed by the construction employed by the plaintiff in its refrigerator Models S-641 and SE-641.

9. Refrigerator cabinets employing the invention of said Yoxsimer patent have been manufactured and sold in large numbers by the defendant, and the Philco Corporation is a licensee under the patent.

*Conclusions of Law:*

1. Plaintiff's refrigerators S-641 and SE-641 infringe the patent in suit.

2. Defendant is entitled to judgment upon its counterclaim.

## Quimper Patent No. 2,254,780

*Findings of Fact:*

1. The validity of claims, 1, 2 and 6, as well as their infringement by Crosley models S–641 and SE–641, are in issue.

2. This patent is for insulating corner strips supporting the inner shell from the outer shell to reduce the weight of the cabinet.

3. Westinghouse does not use this patent, its corner strips being of metal, which have 150 times the heat conductivity of the strips disclosed.

4. The accused Crosley structures bear no resemblance to the disclosure of this patent.

5. The accused structures employ a complete frame extending across the top and down the two sides of the front of the refrigerator to which the inner and outer shells are connected. The frame is of metal and provides a path of high heat conductivity between the inner and outer shells.

6. Crosley does not save any weight by its present structure over the weight of structures used by it more than two years prior to Quimper's application.

7. The patent in suit discloses no invention over Bellamore 1,547,720 or Eggleston 1,911,443, or White 2,166,629, or Hoffenberth et al. 2,169,419, or King 2,176,717, or White 2,220,695.

8. The claims in suit are directed in part to the same subject matter as claims 3 and 4 of Forsthoefel 2,254,604.

9. The claims in suit are directed to features of the same subject matter as claim 3 of Yoxsimer 2,242,335.

10. The patent in suit was forfeited and renewed after the repeal of the renewal statute, Rev.St. § 4897, 35 U.S.C.A. § 38.

11. The accused structures do not employ a plurality of separate diagonal strips secured across the openings of the outer sheet.

12. The accused structures do not employ strips providing a path of low heat conductivity between the inner and outer sheets.

13. The accused structures do not employ a series of separate rigid corner members secured to the rear surfaces of flanges of the outer shell diagonally across the corners of the rectangular opening.

14. The accused structures do not employ means for attaching the flanges of the inner liner at intermediate portions of corner members.

15. The accused structures do not employ strips extending diagonally across each corner of the outer shell.

16. The accused structures do not employ means secured to the rear side of the inner flange at each corner portion of the latter and also secured, respectively, to adjacent diagonal struts for fixedly supporting the inner liner from the outer shell.

*Conclusions of Law:*

1. The patent is invalid because of anticipation by or want of invention over the prior art.

2. The patent is not infringed.

## Anderson Reissue Patent 21,535

*Findings of Fact:*

1. The Anderson reissue patent 21,535, Claims 1 to 4 of which are in suit, relates to a refrigerator cabinet construction wherein the refrigerating mechanism and a temperature control switch therefor are mounted in a lower machinery compartment and a manually-operated control adjusting member is positioned in an opening in a horizontal ledge or wall provided in the cabinet below the door thereof, the adjusting member being concealed when the door is closed but being accessible when it is open.

2. The invention defined in said claims is in a combination of elements cooperating with each other to produce a new and useful result, and is not in one element only of the combination. Therefore, the claims are not for an exhausted combination. Nor are they aggregational because of the inclusion of parts of the refrigerator which are necessary to describe and locate the position of the manually adjustable temperature control member.

3. The application which resulted in said Anderson reissue patent was filed promptly after the alleged errors in the original patent became apparent, and the alleged infringement by Crosley did not begin until after the patent had been reissued.

4. All the essential features of the Anderson invention were fully disclosed in the original application for the patent in suit and were supported by oath of the inventor.

5. The subject matter disclosed in the specification and drawings and covered by

the claims of the Anderson patent in suit required for its production the exercise of inventive skill.

6. The subject matter defined in said claims of said Anderson reissue patent is not anticipated by the prior art.

7. The claims 1 and 2 of said patent disclose a new and useful discovery by Anderson, and each of them is infringed by the construction employed by the plaintiff in its refrigerator Models S–641 and SE–641.

8. Refrigerators employing the invention of said patent have been manufactured and sold in large quantities by the defendant, and Servel, Inc., is a licensee under the patent.

*Conclusions of Law:*

1. Claims 1 and 2 of the Anderson reissue patent are claims in the original patent, and are infringed by plaintiff's refrigerators S–641 and SE–641.

2. The claims numbered 3 and 4 of the Anderson reissue patent contain subject matter wihch was cancelled and withdrawn during the pendency of the original application, and therefore said claims are invalid and defendant is estopped from asserting them.

3. The petition for reissue set forth no facts from which the Commissioner of Patents could have determined that there was inadvertence, accident or mistake in the prosecution of the original patent.

### Forsthoefel Reissue Patent 21,178

*Findings of Fact:*

1. The validity of claims 1 and 3 as well as their infringement by Crosley models SE–641 are in issue.

2. The patent is directed to the use of a crisping pan suspended from an imperforate shelf in a refrigerator.

3. Claims 3 and 4, which were added by reissue, are directed to the same subject matter as claims which were presented in, rejected by the Patent Office and cancelled from the original application.

4. The patent discloses no invention over Corneil 1,734,366.

5. The patent discloses no invention over Braeutigan 1,774,313, or Warren 1,-933,646.

6. The reissue oath sets forth no facts from which the Commissioner of Patents might have determined whether there was inadvertence, accident or mistake during the prosecution of the original application.

7. The claims added by reissue are not for the same invention as the original claims.

8. Westinghouse was guilty of laches in applying for the reissue patent.

9. Crosley has intervening rights as to the claims added by reissue.

10. Westinghouse publicly made and sold the structure disclosed in the patent prior to its application for reissue.

11. The reissue patent was obtained after declaration to the Patent Office to the effect that Westinghouse had used the structure since 1934.

12. Westinghouse did not use the structure of this patent prior to 1937.

13. Claim 3 was first presented more than five years after the application was first filed and is directed to subject matter inconsistent with that originally claimed, and was never supported by the oath of the patentee.

14. Plaintiff's refrigerator SE–641 is directly covered by the patent claim No. 1.

*Conclusions of Law:*

1. The patent is invalid because of anticipation by or want of invention over the prior art.

2. The patent is invalid because of file wrapper estoppel, the claims added by reissue being drawn to the same subject matter as claims which were presented, rejected, and cancelled in the original prosecution.

3. Claim 3 is invalid because it never has been supported by the oath of the patentee.

4. The patent is invalid because the reissue was improper in that the oath was inadequate in that it did not state any facts from which the Commissioner of Patents could have determined that there was inadvertence, accident or mistake during the prosecution of the original patent.

5. The patent is invalid because of laches in applying for the reissue.

6. Plaintiff's refrigerator SE–641 is directly covered by the patent claims.

### Yoxsimer Patent 2,194,176

*Findings of Fact:*

1. The validity of claims 1, 3, 4 and 6, as well as their infringement by Crosley Model SE–641, are in issue.

2. This patent is for a glass shelf above the hydrator.

3. It was old years before Yoxsimer to employ a glass shelf in a refrigerator.

4. The only purpose of using a glass shelf is to secure transparency, an inherent characteristic of the glass.

5. There is no invention in using glass where transparency is desired.

6. There is no invention in the patent in suit over Battista 1,896,693, or McCluney 1,953,765, or Connors 2,006,442, or Forsthoefel 2,072,446, or Moore et al. 2,051,733.

7. The claims of the patent in suit are drawn to an exhausted, aggregational combination.

8. The claims of the patent in suit are functional.

9. The accused structure is described by the claims of the patent in suit.

*Conclusions of Law:*

1. The patent is invalid because of anticipation by or want of invention over the prior art.

2. The patent is invalid because the claims are drawn to an exhausted aggregational combination.

### Kruck Design Patent 112,778

*Findings of Fact:*

1. The validity of this patent, as well as its infringement by Crosley Models S-641 and SE-641, are in issue.

2. The accused structure more nearly resembles the prior art than it does the patent in suit.

3. The patent in suit is not used by Westinghouse.

4. The design of the patent in suit is not used by Crosley.

*Conclusions of Law:*

1. The patent is invalid for anticipation by or want of invention over the prior art.

2. The patent is not infringed.

### Ford Patent 1,967,770

*Findings of Fact:*

1. The validity of claims 1 to 4, as well as their infringement by the manufacturing process used by Crosley, are in issue.

2. The patent is for the use of a test stator to run in the bearings of a motor-compressor unit.

3. Crosley uses a test stator for certain tests in its manufacturing process, but does not run in the bearings by the use of a test stator.

4. The Crosley test stator is in place for less than three minutes. It is impossible to run in bearings in this length of time.

5. The General Electric practices with respect to the use of a test stator prior to September 1929 are substantially the same as the process employed by Crosley.

6. There is no invention in using air for drying a motor-compressor unit.

7. Hill 1,682,565 discloses that rotors do not run freely until the bearings are run in.

8. Whelchell 1,906,030 discloses the use of a test stator for testing the rotating armature of a dynamo. There is no invention in the patent in suit over this reference.

9. Volney 909,261 discloses the use of air for drying.

10. There is no invention in the patent in suit over the process used by the General Electric Company prior to September 1929.

11. Crosley uses bearing surfaces which are very finely machined by grinding, honing or "bearingizing" prior to its use of a test stator, which bearings do not require any running in.

12. Crosley does not dry its units wholly by air flow therethrough.

13. The Crosley practices owe nothing to the patent in suit.

14. Drying is not a part of any properly patentable method in connection with the use of a test stator. The drying step may, and sometimes does, occur a week after the use of the test stator.

*Conclusions of Law:*

1. The patent is invalid for anticipation by or want of invention over the prior art.

2. The patent is invalid because of prior knowledge and public use by the General Electric Company.

3. The patent is not infringed.

### Ashbaugh Patent 2,079,238

*Findings of Fact:*

1. The Ashbaugh Patent 2,079,238, claims 2, 3, 4, 8, 9, 11 and 12 of which are in suit, relates to a method and apparatus whereby complete mechanical refrigerating systems may be safely and economically shipped uncrated in transportation vehicles, such as freight cars.

892

2. The method claims of the Ashbaugh patent in suit are not for the obvious use of unpatentable structures, as alleged by plaintiff, this being particularly indicated by the fact that the evidence does not show that the method claimed was previously used by means of the same or any other apparatus, notwithstanding its advantages.

3. The apparatus claims of the patent suit are not for a mere aggregation of elements, as alleged by plaintiff, because all the parts, including the shipping racks and the means for preventing movement of them on the rails of the transportation vehicle, definitely cooperate to make possible the practical shipping of refrigerator units in uncrated condition.

4. The alleged Crosley prior knowledge and use described in Stipulation No. 10, relating to the use of supports, called "elephants", on which refrigerator units were loosely laid and moved from point to point in the Crosley factory, did not involve the same method or apparatus as disclosed and claimed in the Ashbaugh patent or as employed by Crosley in shipping refrigerating units as described in Stipulation No. 5.

5. All the essential features of the Ashbaugh invention were fully disclosed in the original application for the Ashbaugh patent in suit and were supported by oath of the inventor. No "new matter" was introduced during the prosecution of the Ashbaugh application, such changes as were made being fully consistent with the original application and oath as filed in the Patent Office.

6. The subject matter disclosed in the specifications and drawings and covered by the claims of the Ashbaugh patent in suit required for its production the exercise of inventive skill. The evidence shows that when Westinghouse began using the patented method and apparatus it required considerable negotiation to get approval of the Railroads and a classification by the "Consolidated Classification Committee" which would permit shipping in accordance with the teachings of the patent, and that before Crosley began using the invention it wrote to Westinghouse for detailed information about how to practice it, which information was furnished by Westinghouse, together with notice of the existence of the Ashbaugh patent. Crosley later began the use of the Ashbaugh method and apparatus in disregard of said notice.

7. The method and apparatus defined in said claims of the Ashbaugh patent are not anticipated by the prior art.

8. The claims of the Ashbaugh patent in suit disclose a new and useful discovery by Ashbaugh, and each of the claims in suit is infringed by the process and apparatus employed by the plaintiff as described in said stipulation No. 5.

9. Westinghouse has made extensive use of the invention, beginning in 1935, with great savings as compared with its own and the usual prior practice of shipping refrigerator systems in crates.

*Conclusion of Law:*

Defendant's patent has been infringed by plaintiff, and defendant is entitled to proper judgment upon its counter-claim against plaintiff.

### Roberts Patent 2,188,303

*Findings of Fact:*

1. The Roberts Patent 2,188,303, claims 1, 4 and 5 of which are in suit, relates to a method of testing large numbers of refrigerating systems on a mass production basis by the use of a cold test room in which the temperature and humidity are accurately controlled and through which the systems are moved, while operating, on a timed conveyer with the evaporators and condensing units of the systems exposed to the conditions in the room, the operating characteristics of the respective systems, such as the position of the frost line in the systems, being ascertained after establishment by lapse of time of a uniform test condition, and compared with predetermined standards. The position of the frost line under such conditions is an accurate indication of the total refrigerant charge in the system, and not a mere indication of the level of the liquid refrigerant in the evaporator.

2. The term "substantially" used in claims 1 and 5 of the Roberts patent does not render these claims indefinite.

3. The term "lapse of time", in claims 1 and 5, and the terms "predetermined speed", "predetermined path", "predetermined characteristics", "relatively early" and "relatively later", in claim 4, do not render the claims indefinite because it is apparent from the context and from the specification and drawings what the terms mean.

4. The claims of the Roberts patent in suit set forth a series of method steps in

addition to the observation of the frost line on the refrigerating systems and are not drawn merely to the use of the senses, as alleged by the plaintiff.

5. The subject matter disclosed in the specification and drawings and covered by the claims of the Roberts patent in suit required for its production the exercise of inventive skill.

6. The method defined in said claims of the Roberts patent is not anticipated by the prior art.

7. The claims of the Roberts patent in suit disclose a new and useful discovery by Roberts, and each of the claims in suit is infringed by the method employed by the plaintiff in testing its refrigerators as described in Stipulation No. 2. The plaintiff has admitted infringement of this patent if it is valid.

8. All the essential features of the Roberts invention were fully disclosed in the original application for the Roberts patent and were supported by oath of the inventor. No "new matter" was introduced during the prosecution of the Roberts application, such changes as were made being fully consistent with the original application and oath as filed in the Patent Office.

9. The defendant, prior to the filing of the application, which resulted in the Roberts patent in suit, sold certain standard catalogue air-conditioning apparatus to the Tafel Electric Company (a Westinghouse distributor) of Cincinnati, Ohio, with which the latter filled an order from the plaintiff for such equipment for a test room for refrigerating systems, which test room was used by it in the practice of the alleged infringing method. Such equipment could be used for many other purposes.

10. The defendant did know for what purpose the plaintiff intended to use the equipment sold to plaintiff by said Tafel Electric Company prior to the delivery by it to Tafel had been made. Defendant notified plaintiff of the proposed application for the Roberts patent before said equipment was installed by plaintiff, and offered to grant plaintiff a license to practice the process if it wished to take one. Plaintiff did not reply to the offer.

11. Suit was filed by defendant against plaintiff in Ohio for infringement of said Roberts patent within one year after the issuance of the patent, said suit being still pending but having been suspended in view of the present action. There is no evidence that plaintiff was in any manner injured by the short delay in the bringing of the infringement suit.

12. The method disclosed in the Roberts patent has been used extensively by the defendant in the testing of its refrigerator units and, in addition to greatly improving the quality of the Westinghouse refrigerators, has resulted in savings over a six-year period of approximately $250,000 to defendant.

*Conclusions of Law:*

1. Defendant's patent has been infringed by plaintiff, and defendant is entitled to proper judgment upon its counterclaim against plaintiff.

2. Defendant is not estopped from action against plaintiff by the sale to plaintiff of room air control equipment which became one element in plaintiff's infringing structure, as plaintiff had notice, prior to the delivery of the equipment and construction of the test room described by the patent claims in suit, that defendant proposed to file patent claims therefor in the immediate future and would, in substance, exercise its patent right against plaintiff in case of use by the latter of the patented methods and equipment.

## Terry Patent 2,007,730

*Findings of Fact:*

1. The validity of claims 1 to 4, as well as their infringement by Crosley Models S-641 and SE-641, are in issue.

2. The patent is directed to the idea of salvaging the casing and cover of a hermetically sealed motor-compressor unit which is put together by welding. The parts are salvaged when it is necessary to open such a unit, and used a second time by rewelding.

3. The patent does not disclose the dimensions necessary in order to permit rewelding, although the claims are directed to this feature.

4. There is no invention in welding or rewelding two parts simply because they contain a motor-compressor unit for a refrigerator.

5. The patent in suit discloses no invention over Dunham 1,248,830.

6. The patent in suit discloses no invention over Kucher 1,719,810. This Kucher patent discloses a welded motor-compressor unit in which the parts are apparently sufficiently extensive to permit rewelding.

894

7. There is no invention in the patent in suit over the practice of welding and re-welding a motor-compressor unit practiced by the General Electric Company at Schenectady, N. Y., as early as April 1929.

8. As early as April 1929, the General Electric Company at Schenectady, N. Y., welded and rewelded hermetically sealed motor-compressor units for electric refrigerators in a manner which is the same in all material respects as that disclosed by the patent in suit.

9. The claims of the patent are all drawn to an exhausted, aggregational combination.

10. The patent does not disclose the alleged invention in such full, clear, concise and exact terms as to teach one skilled in the art to practice it.

11. The claims of the patent are indefinite.

12. Westinghouse has been guilty of laches in not suing earlier on this patent, and it may not be enforced against Crosley for this reason.

13. Westinghouse has known of the General Electric welding and rewelding practice since early in 1931.

14. All of the claims in suit were first presented more than three years after the application for patent was filed.

*Conclusions of Law:*

1. The patent is invalid for complete anticipation by or want of invention over the prior art.

2. The patent is invalid for want of invention over the use by the General Electric Company.

3. The patent is invalid because the claims are drawn to an exhausted, aggregational combination.

4. The patent is invalid because the disclosure is not in such full, clear, concise and exact terms as to teach the alleged invention.

5. The patent is invalid because the claims are indefinite.

6. The patent may not be enforced against Crosley because of laches on the part of Westinghouse in bringing suit.

Kucher Patent 1,719,807

*Findings of Fact:*

1. The validity of claims 9, 10, 15 to 18, inclusive, and 22 to 25, inclusive, as well as their infringement by Crosley Models S–641 and SE–641, are in issue.

2. The patent is directed to the use of what is asserted to be a new "liquid working fluid" which is stated to consist of a refrigerant and lubricant which are miscible. The refrigerant is ethyl chloride and the lubricant is mineral oil.

3. The use of ethyl chloride as a refrigerant in household refrigerators preceded Kucher by many years.

4. The use of mineral oil as a lubricant in household refrigerators preceded Kucher by many years.

5. The use of refrigerants and mineral oil in household refrigerators preceded Kucher by many years.

6. The patent discloses no new principle, no new lubricant, no new refrigerant, no new combination of refrigerant and lubricant, no new structure, and no new method.

7. It is a paper patent for structure which has never been built or used commercially.

8. When the refrigerant reaches the receptacle 18, shown in Figure 1 of the patent, it is in vapor phase and is not vaporized within that receptacle as taught and claimed as invention by the patent.

9. The accused structures are identical in material respects with Singer 577,328 and Oswald et al. 1,482,028.

10. The patent in suit discloses no invention over Singer 577,328, or Oswald et al. 1,482,028, or Zoelly 1,263,633, or Parkyn 1,566,919, or Tibbetts 1,568,103.

11. The specification of the patent in suit contains no disclosure or description of the use of the heat of the motor to vaporize liquid refrigerant, as is claimed by some of the claims in suit.

12. In the structure of the patent in suit the heat of the motor does not vaporize liquid refrigerant as claimed.

13. The claims in suit are misdescriptive because they call for the use of heat to vaporize liquid refrigerant within the receptacle 18. No vaporization of refrigerant takes place or can take place within this receptacle.

14. The claims in suit are functional.

15. The claims in suit are drawn to an exhausted, aggregational combination.

16. The accused structures employ as a refrigerant dichloro-difluro-methane, a product known commercially as "Freon" or

"F–12", which is made by DuPont and was unknown at the time the Kucher application was filed.

17. The accused structure employs as a lubricant mineral oil which was well known as a lubricant for electric refrigerators many years prior to Kucher's filing date.

18. The claims in suit are directed to a wholly different and inconsistent invention from the claims originally filed, and none of them were supported by the oath of the patentee.

19. The claims in suit do not read upon the accused structures.

20. The accused structures do not employ a liquid working fluid in the motor-compressor unit as described in the patent.

*Conclusions of Law:*

1. The patent is invalid because of complete anticipation by and want of invention over the prior art.

2. The patent is invalid because all claims in suit are misdescriptive, and some are not supported by the disclosure.

3. The patent is invalid because all the claims are indefinite and functional, including the method claims which define only the inherent function of the machine.

4. The patent is invalid because the claims are drawn to an exhausted, aggregational combination.

5. The patent is invalid because the claims in suit are drawn to subject matter materially different from the claims originally presented, and were never supported by the oath of the patentee.

6. The patent is not infringed.

## Kucher Patent 1,719,820

*Findings of Fact:*

1. The validity of claims 12 to 14, as well as their infringement by Crosley Models S–641 and SE–641, are in issue.

2. This is a companion patent to Kucher 1,719,807 and relies upon the same erroneous theory. It is subject to the defects of that patent. (See 3)

3. The claims in suit are misdescriptive in calling for the heat of the motor to vaporize refrigerant. The heat of the motor does not vaporize refrigerant in the structure disclosed nor does the heat of the compressor vaporize refrigerant outside of the compressor itself.

4. The claims in suit are functional.

5. The claims in suit are drawn to an exhausted, aggregational combination.

6. The claims in suit are directed to the same subject matter as the claims of Kucher 1,719,807.

7. The accused structures of Crosley are the same in material respects with the structures disclosed in Singer 577,328 and Oswald et al. 1,482,028.

8. The claims in suit are directed to an invention which is wholly different from and inconsistent with the claims originally presented.

9. In the accused structures there is no liquid refrigerant in solution in lubricant.

10. The disclosure of the patent has never been commercially utilized.

*Conclusions of Law:*

1. The patent is invalid because of complete anticipation by or want of invention over the prior art.

2. The patent is invalid because all the claims in suit are misdescriptive.

3. The patent is invalid because all the claims are indefinite and functional.

4. The patent is invalid because the claims are drawn to an exhausted, aggregational combination.

5. The patent is not infringed.

## Kucher Reissue 19,908

*Findings of Fact:*

1. The validity of claims 44, 45 and 47 and their infringement by Crosley Models S–641 and SE–641 are in issue.

2. The claims in suit are directed to detachably putting together the casing and cover of a hermetically sealed motor-compressor unit.

3. During the Patent Office prosecution, it was asserted on behalf of Kucher that an air-cooled motor-compressor unit was "exactly opposite to the arrangement employed by Kucher" and the difference was asserted to be that "between a blind Venetian and a venetian blind". Crosley uses an air cooled unit.

4. During the Patent Office prosecution, Kucher's invention was asserted to represent invention over Singer patent 577,328 because Singer's condenser is separate from, i. e. outside of, his sealed chamber while Kucher's sealed chamber contains the condenser as well as the motor and compressor.

5. Kucher's original application was directed to a refrigerating unit in which the motor, compressor, and condenser are all enclosed in a single chamber. In the Patent Office interference proceedings Kucher was held not to be the first inventor of this subject matter and the claims thereto issued to his opponent Kasley in patent No. 1,715,709.

6. The Crosley structure accused of infringement is the same in material respects with the structure disclosed in Singer patent 577,328 and Oswald et al. patent 1,482,028. Both of these patents disclose an air-cooled refrigerator in which the motor and compressor are enclosed within a hermetically sealed chamber and the condenser is separate therefrom and outside thereof.

7. The patent discloses no invention over Singer patent 577,328, or Stokes patent 1,362,757, or Oswald et al. patent 1,482,028.

8. The reissue oath sets forth no facts from which it could have been determined that there was inadvertence, accident or mistake during prosecution of the original patent.

9. The reissue patent is not for the same invention as the original.

10. The defendant was guilty of laches in applying for the reissue patent.

11. The claims in suit are not restricted to the alleged novel elements but reclaim an entire combination of old elements along with the alleged new elements which do not in combination perform any new or different or useful function or operation.

12. The structure disclosed by the patent in suit has never been used commercially.

13. The accused structures are not detachably put together with nuts and bolts as in the patent, but are welded in order to provide a permanent connection.

14. The accused structures do not employ or utilize the alleged invention defined by claims 44, 45 and 47 of the patent in suit.

*Conclusions of Law:*

1. The patent is invalid for anticipation by and want of invention over the prior art.

2. The patent is invalid because the oath was inadequate in that it failed to set forth any facts from which the Commissioner could have determined that there was any inadvertence, accident or mistake during the prosecution of the original.

3. The patent is invalid because the reissue is not for the same invention as the original.

4. The patent is invalid because of inexcusable laches in applying for the reissue.

5. The patent is invalid because the claims are drawn to an exhausted and aggregational combination.

6. The patent is invalid because the alleged invention thereof is not useful.

7. The patent is not infringed.

### Terry Patent 2,040,507

*Findings of Fact:*

1. The validity of claims 7, 8 and 10, as well as their infringement by Crosley Models S-641 and SE-641, are in issue.

2. The patent is directed to a motor compressor unit having double walls through which oil is pumped under pressure, and from which it is sprayed over the motor and compressor through holes in the inner wall.

3. The accused Crosley structure has a single wall. It bears no resemblance to the patent in suit and owes nothing thereto.

4. The patent in suit discloses no invention over Singer 577,328, or Oswald et al. 1,482,028, or Carpenter 1,212,127 or Kucher 1,719,820 or Steenstrup 1,765,289.

5. The claims in suit are drawn to an exhausted, aggregational combination.

6. All of the claims in suit were first presented more than four years after the application was filed, and after the application had been allowed.

7. Westinghouse conducted ex parte tests designed to support the charge of infringement. The tests were of no evidentiary value.

8. In the accused structures there is no means for circulating lubricant from the lower portion of the casing into contact with the upper surface thereof.

9. In the accused structures lubricant, which has been cooled, is not directed over heated portions of the motor-compressor unit to bathe and cool the same.

10. In the accused structures the casing does not have an upper heat dissipating portion, as described in the patent.

11. In the accused structures there is no resilient means for supporting the motor-compressor unit in the casing in spaced relation thereto.

12. In the accused structures the casing does not have a designed fluid-cooled heat-dissipating surface.

13. In the accused structures the lubricant is not filmed against the casing.

14. In the accused structures the lubricant which is in contact with the casing is not spaced from, or out of contact with, heated portions of the motor-compressor unit.

15. The slight spatter of oil against a small portion of the casing in the accused structures is incidental, of no significance, and does not add to the efficiency of the unit, or improve its operation.

*Conclusions of Law:*

1. The patent is invalid because of complete anticipation by or want of invention over the prior art.

2. The patent is invalid because the claims are drawn to an exhausted, aggregational combination.

3. The patent is not infringed.

### McCloy Patent 2,181,856

*Findings of Fact:*

1. The validity of all 18 claims, and their infringement by Crosley Models S-641 and SE-641, are in issue.

2. This patent is directed to a heat exchange between a cold suction tube and a warm liquid supply line. Some of the claims are limited to a capillary supply line.

3. The patent in suit is a continuation in part of the application Serial No. 122,905, filed January 29, 1937, which was abandoned. That earlier application contained no disclosure of soldering the two lines together. The present patent contains a disclosure that the two lines "preferably" be soldered, and the claims were allowed by the Patent Office on the basis of the improvement alleged to be effected by soldering.

4. None of the claims of the patent is limited to a soldered connection.

5. Heat exchange was effected by soldering the cold suction line to a warm liquid supply line some years prior to the McCloy application.

6. The claims of the patent define all possible locations of heat exchange, that is, heat exchange in insulation, heat exchange out of insulation, heat exchange both in and out of insulation, and heat exchange wherever it may be located.

7. Heat exchange between a cold suction line and a warm liquid supply line or a capillary tube was old many years before McCloy.

8. The selection of where a heat exchange is to be located is a mere matter of choice or design and does not involve invention.

9. There is no invention in placing a heat exchange within the insulation.

10. The advantage, if any, in placing a heat exchange in the insulation is so slight as to be immaterial.

11. The patent in suit discloses no invention over Miles 1,321,230, or Muffly 1,806,019.

12. The patent in suit discloses no invention over the article in "Electric Refrigeration News" for September 16, 1933, page 17.

13. The patent in suit discloses no invention over the structure used by the Frigidaire Company in 1935 and 1936.

14. In 1935 and 1936 the Frigidaire Company manufactured and sold many thousands of refrigerators having a heat exchange between a cold suction line and a capillary liquid supply line, with heat exchange both in and out of the insulation.

15. The claims of the patent in suit are vague and indefinite.

16. The accused structure owes nothing to the disclosure of this patent.

*Conclusions of Law:*

1. The patent is invalid because of anticipation by or want of invention over the prior art.

2. The patent is invalid because of prior knowledge and use by Frigidaire.

3. The patent is invalid because the claims are vague and indefinite.

4. Plaintiff's structures are covered by the patent claims in suit.

### General Conclusions of Law

1. The court has jurisdiction of the parties and of the subject matter of the complaint and the counterclaim.

2. The defendant, The Westinghouse Electric & Manufacturing Company, has title to all of the patents in suit and to all causes of action for infringement thereof.

3. The plaintiff, The Crosley Corporation, is entitled to a judgment of noninfringement without prejudice except as to any structures or methods heretofore used

by the plaintiff with respect to White reissue patent No. 21,864, and Forsthoefel patent No. 2,254,604, which were withdrawn from suit by the defendant, and with respect to claims 2 and 4 of Forsthoefel reissue patent No. 21,178, claim 2 of Yoxsimer patent 2,194,176, claims 6 and 14 of Ashbaugh patent No. 2,079,238, claims 2, 3 and 6 of Roberts patent No. 2,188,303, and claims 4, 5 and 6 of Kucher patent No. 1,719,820, which were also withdrawn at the trial.

4. The prior art patents and publications and the alleged instances of prior knowledge and use which were not pleaded in plaintiff's reply to the counterclaim herein, or otherwise noticed at least thirty days prior to the trial, against any particular patent in suit, as required by R.S. § 4920, 35 U.S.C.A. § 69, cannot be urged for purposes of anticipating or invalidating such patent, but can be used only to show the general state of the art.

5. Plaintiff did not, by the purchase of certain standard Westinghouse air conditioning equipment from the Tafel Electric Company under the circumstances stated in Findings Nos. 9 and 10 of the Roberts patent (2,188,303) above, acquire an implied license to use the invention of the Roberts patent, and the provisions of section 4899, R.S., 35 U.S.C.A. § 48, do not apply to the facts of this case.

### Discussion

The present action involves eighteen patents, all relating to electric refrigerators. The Westinghouse Electric and Manufacturing Company (hereinafter called Westinghouse) had filed actions against The Crosley Corporation (to be called Crosley) upon the patents in suit in the Southern District of Ohio, but one day before the filing Crosley had filed the present suit in this court under the Declaratory Judgment Act, whereby it prayed that each of the patents be declared invalid and/or not infringed. The Circuit Court of Appeals, 3 Cir., 130 F.2d 474, has determined that this court has jurisdiction, and therefore Crosley appears in the guise of plaintiff.

Westinghouse has filed counter-claims, asserting infringement of the patents in suit and praying proper relief thereon.

The evidence offered in this suit was very voluminous. The plaintiff offered sixty-four exhibits, of which twenty-six were file wrappers and twelve were books of claimed prior art, which contained from four to nineteen patents or trade publications cited against the patents in suit. The defendant offered thirty-two exhibits, most of which were charts showing drawings of the patents in suit compared with drawings of the Crosley refrigerators.

While the trial was progressing the court had occasion to admire the speed, manner and precision with which counsel for both parties tried their cases, but it was not until the throes of attempted decision had been reached that it really appreciated their labors which had preceded the trial and the amount of the labor which they (temporarily) left behind them.

Neither Westinghouse nor Crosley were pioneers in the manufacture and sale of electric refrigerators, and from that fact it follows that certain of the patents in suit claim only improvements, some of them of a minor character, upon existing refrigerators. Westinghouse put its first refrigerator in the market in 1930 and Crosley followed in about one year. Investigation, however, preceded the entry of each into the art. Some of the patents in suit have never appeared in the patent form in any manufactured refrigerator. Other constructions which included ideas of several of the patents, obtained very considerable commercial success.

In some of the patents in suit the attorney for Westinghouse used a "House-That-Jack-Built" method in setting forth the claims. Having one assertion of novelty in a claim he frequently preceded it with a number of old elements of electrical refrigeration and refrigerators to which the patentee had no claim whatsoever. This practice had led to charges by plaintiff's counsel that the claims were drawn to an exhausted combination and to an aggregation of elements which did not mutually contribute to produce a unitary result. The practice, when unnecessary, is not to be commended; but it may be tolerated—and has been by the court—where the old elements were reasonably necessary for description of the alleged novelty, or the novelty acted with the old elements to produce a new result. When it disclosed nothing new and useful the patent was invalid at any rate.

Counsel for the plaintiff has contended that several of the patents in suit disclose double patenting. The patentees of the structures in suit are engineers in the employ of Westinghouse. Working together,

and with their minds employed upon much the same problems, it follows almost as a matter of course that the specifications of some of the patents, upon first reading, will appear to duplicate the same design. Further study and consideration of the claims will usually disclose that the problems claimed to be solved, although related, are not identical. It does not follow from such a conclusion, however, that the validity of the patents is unquestionable.

Counsel for plaintiff has criticized severely the Patent Office procedure in respect to a number of the patents, particularly the reissue patents. Some of the patents were in the Patent Office, and under constant fire, for a long time. One, Kucher reissue 19,908, reissue of 1,797,287, was there for ten years before the original issued, and five years more before the reissue. The criticisms offered have been considered in the Findings of Fact and Conclusions of Law.

One who is required to examine many patent files will doubtless arrive at two conclusions: the first, that Patent Examiners are likely to be moved as was the unjust judge of the Scriptures, who unwillingly rendered a judgment because he was wearied by "much coming"; and the second, that a reasonable amount of charity will relieve patent counsel from reliability for statements made to Examiners in patent applications on account of the enthusiasm with which they urge their contentions. These conclusions are not wholly inapplicable to the patents in suit.

While other testimony was given on behalf of each party to the action, the plaintiff and defendant each relied upon one expert witness, John W. Craig, Chief Assistant Refrigeration Engineer for Crosley, and Harry R. Van Deventer, Consulting Engineer and Patent Attorney for Westinghouse, and the decision of the court must be based largely upon the consideration of their testimony. It may reasonably be inferred that Mr. Craig, as an employee of Crosley, has a very considerable interest in the result of the case. If so, in rendering his testimony his partizanship was not nearly so obvious as was that of Mr. Van Deventer, who, particularly upon cross-examination, was inclined to be argumentative and evasive. Sometimes several pages of the transcript were covered to require him to answer directly a question which obviously should have been answered the first time it was asked. And

again, on direct examination he testified that he had made several ex parte tests upon Crosley's structure and detailed the results thereof. On cross-examination it developed that he had not made the tests, that they were not made in his presence, but that they were made by an employe of Westinghouse who had informed him of his results. In claiming these tests and their results as his own the court unquestionably acquits Mr. Van Deventer of any willful intent to state that which was untrue, but not of a partizanship which calls for a rather close scrutiny of his testimony.

The patents in suit will be briefly considered in addition to the Findings and Conclusions of Law.

### Forsthoefel Patent No. 2,166,630

The original of this patent was filed in 1936, and was later abandoned. The present patent was a divisional application filed May 26, 1939, and issued July 18, 1939. It relates to a refrigerator cabinet construction mounting a heat breaker strip (to minimize heat flow) between the inner and outer walls of the cabinet and for holding it in relationship to the walls of the cabinet. It was never put into manufacture by Westinghouse in the exact form shown by the patent, but certain of its features have been incorporated in constructions disclosing features of other patents.

The Crosley constructions S–641 and SE–641 are by no means Chinese copies of the patent drawings but seem to be made up of equivalents to the extent that they infringe. The patents cited as anticipations do not cover fully the patent claims.

### Yoxsimer Patent No. 2,242,335

The original was filed January 28, 1937, and abandoned. A continuation was filed May 24, 1940, and issued May 20, 1941. This continuation has been attacked by counsel for Crosley as an illegal expedient to avoid the repeal of the renewal statute, Rev.St. § 4897, 35 U.S.C.A. § 38. The authorities cited in support of the attack have been reversed.

The patent also relates to the retention in position of a breaker strip between the inner and the outer walls of a refrigerator cabinet by a groove upon one wall and a preformed S-shaped strip which may, without deforming it, be slid into a flange of the other wall. The patent itself shows that the S-shaped member was acknowl-

edged to be adopted from a Forsthoefel application which is now patent No. 2,205,-780, which is so near to this patent as to seem almost, although not quite, its twin.

■ It must be confessed that certain of the patents cited as anticipations, particularly Connelly, No. 2,123,403, and Coughlin, No. 1,059,840, gave the court pause, although not quite to the extent of overcoming the presumption of validity incident to the issue of the patent.

■ This patent, with the features of Forsthoefel No. 2,166,630 and Quimper No. 2,254,780, joined to other features of electrical refrigerator construction which are admitted to be old, has appeared in many thousand refrigerators manufactured and sold by Westinghouse. The Crosley structures, although not exact copies, followed it very closely after it was put into commercial use.

### Quimper Patent No. 2,254,780

■ This patent discloses a flat front refrigerator, although that is not the feature it is entitled to claim. When its specifications are considered in connection with Forsthoefel 2,254,604, and Yoxsimer No. 2,242,335, its family relationship with those patents will be quite apparent.

The patent is for corner strips supporting the inner wall of the cabinet from the outer wall. The purpose claimed is to provide a path of low heat conductivity, by making the diagonal corner strips of heat-insulating material, and to reduce the weight (and thereby the cost) of the cabinet by doing away with the necessity of a steel frame.

Crosley structures do have corner supports but they are not of heat-insulating material, but of steel. Its refrigerators have a steel frame to support the walls of the cabinet and therefore do not have the advantage of reduction of weight which is one of the chief advantages claimed for the patent. The Crosley structures, despite the corner strips, do not infringe the patent. As to the effect of these strips or struts, it is shown rather fully in prior patents. Bellamore No. 1,547,720. very closely discloses it. True, Bellamore is for a safe, not a refrigerator, but after all both patents relate to cabinet construction. Eggleston No. 1,911,443, discloses certain of the features of Quimper, although it is apparently closer to Crosley constructions and thus serves as an anticipation of Quimper.

### Anderson Reissue Patent No. 21,535

The claims in suit of the patent, Nos. 1 to 4, relate to a refrigerator combination wherein a manually operated cold control member is mounted on the front wall of the refrigerator below and behind the cabinet door. The Westinghouse manual control member is in flat circular form and is situated over an opening on a horizontal ledge in the cabinet below the door and is concealed when the door is closed. Crosley's control member is located just as is that of Westinghouse. It is in form a knob which connects with the control lever which is contacted through an opening in the horizontal ledge.

■ As the court views the patent, claims 3 and 4 in suit are invalid. When before the Patent Examiner the patentee presented claims which called for a visible manual control member. These claims were cancelled and withdrawn, and therefore the patentee or his assigns is estopped from proceeding in reissue upon claims which in effect are the same as those cancelled. The first two claims in suit are the claims of the original patent and are valid. The other claims call for a manually operated member "partially concealed". If it is partially concealed it is also partially visible, and comes within the scope of the cancelled claims.

In the Patent Office Weyman Patent No. 2,054,474 was cited against Anderson, who distinguished by saying that his patent provided "that the manually adjusting member is disposed in a horizontal surface of the cabinet and it also sets forth that the manually operable member is only adjustable when the door is open." This was against Weyman who disclosed an operable member below, but not behind, the door of the refrigerator. The Examiner, upon the application for reissue, again cited Weyman and said: "The broad concept of exposing the dial 32 of Weyman through an opening in a horizontal wall portion or ledge would be merely a matter of design not involving invention." However, after subsequent argument, the patent issued.

■ Doubt as to whether the patent disclosed the dignity of invention has been resolved in favor of the owner of the patent for two reasons; first, the issue carries with it the presumption of validity, and second, Crosley promptly adopted the location of the manually controlled member after Westinghouse had disclosed it in its refrigerators.

## Forsthoefel Reissue Patent No. 21,178

Claims 1 and 3 are in issue. Claim 1 was in the original patent and claim 3 was added. The original patent application was filed on February 23, 1934, and the patent issued March 2, 1937. The reissue application was filed February 14, 1939, and the reissue was allowed on August 22, 1939.

The purpose of the reissue is not very apparent unless the intention was to cover the use of a glass shelf to serve as a cover to the hydrator or crisping pan in a refrigerator. The original patent was for a crisping pan slidably suspended from an imperforate shelf in a refrigerator. The added claim 3 differs from the original in that the shelf is declared to be readily removable.

Insofar as the new claim is concerned, the reissue has a questionable foundation. In the affidavit with the reissue it was stated: "Deponent's attorneys, upon giving said claims (original) further study while reviewing the recent developments by the assignee of the present patent, first appreciated that the claims were not drawn in such terms as to unequivocally cover equivalent constructions included in his invention." In other words, patentee and counsel had slept until advancing practice had awakened them. Slumber so disturbed furnishes no basis for new claims by which advancing art may be halted.

Plaintiff's hydrator cover reads directly upon claim 1, set forth in both the original and reissue patents. An examination of the prior art will disclose, we think, that the basic ideas of the patent were anticipated. Crisping pans in refrigerators were in use considerably before the patent in suit. Braetigam Patent No. 1,774,313 very closely discloses the idea of the present patent. It shows a crisping pan slidable from its imperforate cover. The patentee, however, for the circulation of air, shows rods above the cover which may act as the shelf. If these rods were removed, the patent would revert to that of the present patent. Warren Patent No. 1,943,646, discloses a frame in a refrigerator with which three drawers are slidably mounted. The top of the frame is both a shelf and an imperforate cover for the upper crisping pan. The claim in suit reads upon Warren. Corneil Patent No. 1,734,366, also anticipates the claim.

## Yoxsimer Patent No. 2,194,176

This patent is an illegitimate descendant of Forsthoefel Reissue Patent No. 21,178. Its only alleged advance over its ancestor is in an imperforate glass shelf over the crisping pan in the place of the imperforate shelf, of indeterminate material, of Forsthoefel.

In the Patent Office the Examiner cited Battista Patent No. 1,896,693, which discloses a refrigerator with glass shelves. The patentee's counsel attempted to distinguish by declaring that the object of the Battista patent was to reduce the glass shelves to such a low temperature as to cause them to frost and become opaque. Strangely enough, he got away with his argument despite the fact that Battista had stated in his specifications: "It is therefore unnecessary to maintain the glass shelves at such low temperature as will cause them to frost and thereby become opaque." The fact is that if the temperature below the glass shelf of Yoxsimer and that of Battista be kept above 32°F., neither will become opaque, and if it is lower than that temperature, both will become opaque.

McCluney Patent No. 1,953,765, discloses a glass hydrator, with a glass cover, and claims all the advantages claimed by Yoxsimer.

The replacement of an imperforate cover for a crisping pan by another imperforate cover of glass certainly does not seem to achieve the dignity of invention, even though not anticipated by prior glass shelves.

## Kruck Design Patent No. 112,778

Crosley's constructions show a faint design which somewhat resembles the conventional markings shown by the design patent. It is not identical with it.

Westinghouse, in its latest models, does not use its own design, but one which shows a ridge running from top to bottom on the middle part of the cabinet door. Except for this ridge, Westinghouse and Crosley, and except upon very close inspection, each shows only a flat-front white enamel refrigerator which differs from refrigerators of other manufacture in appearance to a hardly noticeable extent.

## Ford Patent No. 1,967,770

This patent "relates to a process of manufacturing mechanical refrigerating

systems in which a test stator is used to test the compressor prior to the sealing of the operating mechanism in a casing, and is later replaced by a lubricant-free permanent stator, after which the system is thoroughly dried with a dry gas, such as air." (This quoted from defendant's request for findings of fact).

The main use of the test stator, as stated in the patent, is "to run the bearings." The plaintiff uses a test stator in its manufacturing process, but not for the purpose of running in the bearings. For that purpose it is necessary to operate the test stator for at least three hours, and Crosley only uses its test stator three minutes, its parts being already so smooth as not to require running in. The use is for the purpose of testing the operation of the parts.

The use of the test stator, to the extent that Crosley has used it, is older than Ford's patent. In 1929 General Electric Company publicly used hardened journals and casting such as Crosley is now using for test purposes but not to run in the bearings.

Several claims, in addition to the "running in" feature, provide for forcing a dry gas through the casing containing the motor and compressor after it was hermetically sealed. Crosley has followed, in the main, the method of the General Electric Company used in 1929, in that it used a vacuum while the casing was being dried in an oven, although at one stage dry air was used in addition thereto. The court is unable to see that the one element of forcing air through the apparatus for the purpose of drying it constitutes invention. Ford, prior to the application for the present patent, filed a patent for a method of drying out a refrigerator unit. All the claims were rejected by the Patent Office and the application was abandoned.

### Ashbaugh Patent No. 2,079,238

During the first part of the period they have been manufacturing refrigerators, at least, both Westinghouse and Crosley made their refrigerating apparatus in a city other than that in which it was installed in the cabinet. For a time, it was necessary, in shipping by railroad, to crate the refrigerating units. The method provided in the instant patent materially reduced the labor and cost of the shipments. The patent is for apparatus for transporting refrigerating machines having elements which are flexibly connected and spaced apart, the combination of a vehicle (freight car) having a plurality of supporting rails secured thereon and a plurality of racks for supporting the refrigerating units to be transported, the spaced elements of the units being secured to the racks in spaced relation, and said racks and their supported elements being mounted beside each other on the rails, and means for maintaining the racks on the rails so that movement thereon is prevented.

Certain patents, prior in date to that in suit, were cited by the defendant. Some of them show racks which hold baskets of fruit or the like, methods for preventing automobiles from movement while being transported in a freight car. Only one alleged anticipation relates to the transportation of a refrigeration unit, and that only indirectly, King Patent No. 1,825,870. That patent discloses no rack or method such as contemplated by the patent in suit. None of the anticipations solve the problem which was before the patentee in the instant case.

The plaintiff claims a prior use by itself, in the shape of an "elephant" upon which refrigerating units were taken from one part of its plant to another part. This vehicle is described in Stipulation No. 10. It did not, as we think, meet the problem of the patentee herein or cover his rack and method of transportation.

### Roberts Patent No. 2,188,303

This patent shows a method for testing refrigerator units by moving them on a conveyor through an air conditioned room, by which a constant temperature and humidity are preserved. The Primary Examiner rejected all of the 47 claims in the application before him. The patentee cancelled 41 of the claims, and appealed to the Board of Appeals of the Patent Office upon the remaining 6 claims. That body overruled the Examiner and allowed the patent. Upon the presumption of validity so created this court must rely, as it feels that the mass testing patents cited as anticipations do not to its satisfaction overthrow the presumption.

Plaintiff, in addition to its contention of invalidity, has urged that it has been, in effect, licensed to use the patent. Shortly prior to the issue of the patent, officers of Crosley witnessed the operation described in the patent when upon a visit to Westinghouse's plant. Later Crosley ordered from a Westing-

house distributor in Cincinnati equipment for an air-conditioned room such as was necessary in the practice of the patent, and which could be used for other purposes. The distributor was not an agent of Westinghouse. When the equipment was ordered by the distributor for delivery to Crosley it was not known by Westinghouse that Crosley proposed to establish a test room of the patent, but this purpose was known before delivery of the equipment and counsel for Westinghouse notified Crosley that it proposed to shortly seek a patent upon the test method and offered to give a license thereon. Crosley did not reply to this notification and went ahead with its establishment of the air-conditioned room and the installation of the other equipment necessary.

Were the use of an air-conditioned room the only element and idea of the patent, undoubtedly Crosley would be entitled to use the equipment purchased through Westinghouse's distributor without payment of any royalty. But such is not the case. If the patent, considered as a whole, is valid, then Crosley took its chances and is liable for infringement.

### Terry Patent No. 2,007,730

 This patent has been infringed by Crosley if the patent is valid.

It is the practice in perhaps nearly all modern refrigerators to have the motor and compressor thereof in a welded casing. When anything goes wrong inside it is necessary for the manufacturer to cut open the two parts of the casing for purposes of repair. The present patent is certainly not complex. Its teaching is that when the parts of the casing are welded together sufficient material should be left on the connecting flange to allow the end to be cut off and yet have enough to allow of its being rewelded one or more times. The basic idea of the patent is simple. The Patent Examiner, even after "much seeking", denied patentability on, inter alia, Dunham Patent No. 1,248,830, and Kucher Patent No. 1,719,810. Dunham showed a water ballast lawn roller having a central tube, a shell and two heads. The heads have flanges at the center and around their ends which are welded to the central tube and the shell. One figure of the patent drawing shows an enlargement of the outer shell and adjacent flange before welding, and another figure after welding; and another figure showed an enlargement of the flange and the axial tube before welding and another figure showed it after welding. The Board of Patent Appeals reversed the finding of the Examiner and allowed the patent, although admitting that the flanges in Dunham were long enough to allow them to be cut off and rewelded.

Kucher Patent No. 1,719,810, cited by the Examiner, was also mentioned by the Board of Appeals, as follows: "It is old in this particular art to provide the parts of a casing designed to enclose a motor and compressor with a flange and cooperating part which are welded together, as shown in the patent to Kucher. The flanges provided in this patent are not of great extent and apparently the removal of the first weld would leave insufficient material to provide for a second or subsequent welds in case of servicing. The Examiner urges that there is sufficient metal but as long as the patent teaches no such procedure we think it doubtful if sufficient metal is provided."

In view of the rejection of Kucher the approval of the patent in suit seems rather strange, because Terry does not show how much metal was necessary to be sufficient for rewelds, although that might easily have been done, as per Stipulation No. 3, that 3/32 of an inch is sufficient.

Independent of any Patent Office matter, it would seem that any mechanic of a reasonable amount of skill, knowing that a welded flange might have to be cut off and rewelded, would realize the necessity of providing enough metal for the reweld.

That the provision of sufficient flange for rewelding was not new when the patent application was filed is established by the anticipations cited by plaintiff and by the prior art. The General Electric Company used a flange sufficient for rewelding in sealing its motor and compressor unit more than two years before the present patent application.

### Kucher Patent No. 1,719,807
### Kucher Patent No. 1,719,820

### Kucher Reissue No. 19,908 (Reissue of Patent 1,797,287).

 The above three patents are closely related. No. 1,719,807 and No. 1,719,820, were each filed on June 4, 1923, and each was granted on July 2, 1929. Kucher Reissue No. 19,908 was filed on October 22, 1921, and the original issued

on March 24, 1931, and the reissue on March 31, 1936.

The real claim of the original of the reissue patent was for a refrigerating unit in which the motor, compressor and condenser were in a single container. The patentee, however, claimed simplicity and easy access to its parts, and also asserted great value in the lubricating systems. The claims in suit relate to a hermetically sealed casing enclosing a motor and compressor, the sealing being by means of nuts and bolts.

Kucher No. 1,719,807 differs slightly from the reissue patent. The condenser is not in the same casing as the motor and compressor, and a chamber for the collection of oil is placed around the compressor. The lubricant is pumped against a baffle and falls therefrom on the compressor. Its main claim is to a liquid working fluid which is miscible, the liquid being a mixture of ethyl chloride and mineral oil.

Kucher Patent No. 1,719,820 is, in structure, a combination of the reissue patent and No. 1,719,807. It has the motor, compressor and condenser in the same receptacle, as in the reissue. It varies from No. 1,719,807, in that the oil receptacle surrounds the motor, while in No. 1,719,807 it is above and around the compressor.

None of the three Kucher patents was ever manufactured for commercial use. Mr. Van Deventer saw one of the three patent structures (he was uncertain which) in operation in the Westinghouse plant in Philadelphia in 1923 or 1924. In view of the fact that it never attained commercial use it is to be inferred that in operation it was far from fulfilling the predictions of the patentee.

The claims of the reissue patent in suit are confined to the hermetical sealing of the motor and compressor by nuts and bolts. Crosley's structure does not have the motor, compressor and condenser in one container, and its casing for the motor and compressor is welded, not sealed by nuts and bolts. When the patent was on its stormy passage through the Patent Office the Examiner at one time rejected it in Stokes British Patent No. 150,017. The patentee's counsel contended that his claims were "clearly allowable over Stokes since they set forth that a portion of the casing is removable to provide access to the various parts of the refrigerating machine. In Stokes, the casing is obviously sweated together and removability is not present." If this declaration is to distinguish the patent in suit from Stokes, it is certain that Crosley, whose casing is welded, does not infringe. Singer Patent No. 577,328, Stokes, No. 1,362,757, and Oswald, Patent No. 1,482,028, clearly anticipate the patent. Oswald shows the sealing of the casing of the motor and compressor by nuts and bolts.

Kucher Patent No. 1,719,807, first claims for its novelty the miscible working fluid of ethyl chloride and mineral oil. This feature is anticipated by Parkyn Patent No. 1,566,919. It also claims to utilize a portion of the heat generated by the compression mechanism to vaporize off the refrigerant component of the liquid working fluid and to utilize the residue as a fluid for lubricating the working parts of the machine. The testimony which the court has accepted is to the effect that the heat generated by the motor mechanism does not, and cannot, vaporize off the refrigerant component of the working fluid.

Patent No. 1,719,820, does not claim the vaporization of the refrigerant component by the heat of the motor. Otherwise the patent is practically the same, and subject to the same defences as No. 1,719,807. Claim 12 does provide for draining the lubricant, after having subjected it to heat for separation of it from the refrigerant, to a reservoir. Crosley has no reservoir. The other claims call for draining to the lower portion of the casing. The means for draining is nothing else but gravity.

### Terry Patent No. 2,040,507

This is another patent which has never attained commercial use.

The construction is of the low pressure variety. The drawings disclose a casing with double walls between which oil is circulated. The oil is supplied to an oil pump from the bottom of the casing. It is pumped in the space between the walls, and is forced to the top of the space where it is cooled by contact with the outer wall, and is sprayed over the motor and compressor unit to cool it. Claim 8 calls for resilient means for supporting the motor-compressor unit in the casing in spaced relation thereto. Claims 7 and 10 call for a fluid-cooled, heat dissipating surface. Claim 8 recites that the casing has an upper heat-dissipating portion, and seems to refer to the outer of the two walls at the top of the casing.

Crosley has a single wall casing. A disk pump throws the lubricant from the bottom

of the casing to a receptacle below the top wall of the casing, from which it flows by conduits to the bearing parts of the working parts. The oil so pumped does not come in contact with the upper wall and does not fall upon the motor-compressor as is shown in the patent. The disc pump, in lifting its main load to the receptacle from which the movable parts of the motor and compressor were fed, throws out a very small stream of oil against the side wall of the casing. This stream struck the side about an inch from the surface of the oil in the bottom of the casing and covered less than a square inch of the casing. It was plainly incidental to the operation and not intended to act, and not acting, in accordance with the patent method. It was concerning this small discharge against the side of the casing that the ex parte tests were made which were mentioned supra in connection with the testimony of Mr. Van Deventer. The court, in addition to a confessed disinclination to pay too much attention to ex parte experiments, is led in part by his observation of the size and location of the discharge and the criticism of the methods of the test by Mr. Craig, to give but little weight to the testimony relative to the tests. Even if they were entitled to full faith, however, the claims of the patent were not met.

### McCloy Patent No. 2,181,856

"The McCloy Patent No. 2,181,856, all eighteen claims of which are in suit, relates to refrigeration apparatus of the compression type in which a capillary tube is employed to conduct and control the flow of liquid refrigerant from the condenser to the evaporator of the system, and in which the capillary tube is arranged in heat exchange relationship, with the suction line or tube through which relatively cool, gaseous refrigerant is conducted from the evaporator to the compressor." Claim 18 states that the suction and capillary tubes are convoluted or coiled together, for a substantial portion of each. The claim is so plainly met by prior patents, and is not in accordance with the Crosley construction, that it requires no further comment.

Some of the claims have the capillary and the suction lines metallically bonded together, and some have the heat exchange lines extend from the machinery compartment at the bottom of the cabinet to substantially the point where they enter the food-storage compartment near its top;

and some claims call for a part of the heat exchangers in the heat insulation of the cabinet, and some that they be exposed outside of the cabinet. In short, practically all combinations and positioning of the capillary and suction lines are covered.

The patent shows two forms of the heat exchange, one within the insulation, where the capillary is coiled around the suction line, and the other outside of the insulation from the machinery compartment to the evaporator near the top of the cabinet. All the claims do not call for a "capillary tube", but call for "a tube of small diameter and considerable length for restricting the flow * * *".

In view of the prior art (e.g., Miles 1,321,230, Muffly No. 1,806,019, Frigidaire Bulletin, March 1935, Ex. 28) McCloy can claim no invention in placing the capillary and suction tubes in intimate heat-exchanging position, with the benefits flowing therefrom. His patent file shows it. If his patent is to stand it must do so by reason of his soldering the hot and cold lines together, and thus improving the heat-exchange.

In that idea he was anticipated in the refrigeration art. By the Frigidaire Bulletin, supra, the following appears: "An improved interchange of heat, however, is obtained in the new units by sweating (-soldering) the suction and liquid lines together. Fig. 9–D. The lines are sweated together for a distance of about two feet, starting with the charging valves on the top of the cabinet and extending into the freezer. * * *".

"In order to overcome this condition (no liquid refrigerant in the receiver) and increase the performance of the units, a capillary tube located back of the condenser, Figure 17–A, is provided and is a part of the liquid line connecting the bottom of the condenser to the interchanger and restrictor. If refrigerant vapor at any time during the cycle begins to pass from the condenser into this tube, the flow is automatically retarded because this small tube offers considerable resistance to the flow of gas, but practically none to the flow of liquid."

McCloy was also anticipated in the art by Westinghouse's own publication. In an article in Electric Refrigeration News, September 6, 1933, p. 17, wherein Westinghouse's refrigerator "introduced a few weeks ago" was advertised, a new heat exchanger is described, as follows:

"Replacing the several circular metal fins which were fastened to the suction line of last years models to absorb enough heat to prevent condensation in the compressor compartment, is a new heat exchanger.

"Westinghouse engineers explain that this device performs the same function as a pre-cooler in a water cooler, or heat exchanger in a commercial refrigeration system. This thermal device simply exchanges heat from the hot liquid line to the cold suction line, utilizing the refrigeration effect remaining in the suction line to cool the condensed liquid and at the same time preventing condensation of moisture on the suction line. It consists of 6-inch vertical lengths of the suction and liquid lines soldered together between the condenser and the float valve."

True, both Frigidaire and Westinghouse used valves to aid in the heat exchange, but the basic idea of the McCloy patent was with them. Had the Patent Examiner had the Frigidaire and Westinghouse publications and Miles 1,321,230 before him, it is inconceivable that the patent would have issued.

Let a decree in accordance with the foregoing findings of fact and conclusions of law be presented.