CROSLEY CORPORATION v. WESTINGHOUSE ELECTRIC & MFG. CO.
(two cases).
Nos. 8581, 8600.

Circuit Court of Appeals, Third Circuit.
Argued Oct. 17, 1944.

Decided Dec. 14, 1945.

Samuel E. Darby, Jr., of New York City (Christy, Parmelee & Strickland, of Pittsburgh, Pa., Floyd H. Crews, of New York City, and Alden D. Redfield, of Cincinnati, Ohio, on the brief), for appellant.

Carl S. Lloyd, of Chicago, Ill. (Victor S. Beam, of New York City, and Brown, Critchlow & Flick, of Pittsburgh, Pa., on the brief), for appellee.

Before GOODRICH and McLAUGHLIN, Circuit Judges, and BARD, District Judge.

McLAUGHLIN, Circuit Judge.

These cross-appeals involve the validity and alleged infringement of nine patents relating to refrigerators. Each appeal concerns five patents, with one patent appearing in both appeals. On July 31, 1941, Crosley instituted suit against Westinghouse seeking a declaratory judgment of invalidity and noninfringement of sixteen patents owned by Westinghouse and declared by the latter to have been infringed by Crosley. Westinghouse counterclaimed, charging infringement of the sixteen patents and of two others which had been issued after the above referred to complaint had been filed. Westinghouse later withdrew two of the patents, and certain claims of other patents from the counterclaim. Of the sixteen patents passed upon by the Court below, judgment of invalidity or noninfringement, or both, was entered as

to eleven with five held to be valid and infringed. Crosley is appealing from the judgment on the five patents which were held to be valid and infringed. Westinghouse appeals from the judgment as to five of the patents which were held to be invalid and/or not infringed. As to the patent involved in both appeals, some of its claims were held valid and others invalid.

In No. 8600, the District Court held invalid Quimper Patent 2,254,780, Kruck Design Patent 112,778, Kucher Patent 1,719,807, McCloy Patent 2,181,856, and Claims 3 and 4 of Anderson Re-issue Patent 21,535. That judgment is affirmed on the opinion of Judge Gibson in the Court below, 52 F.Supp. 884.

Claims 1 and 2 of Anderson Re-issue Patent 21,535, Forsthoefel Patent 2,166,630, Yoxsimer Patent 2,242,335, Ashbaugh Patent 2,079,238 and Roberts Patent No. 2,188,303, held valid by the District Court require more detailed discussion.

## I. Anderson Re-issue Patent No. 21,535

The temperature of the type of refrigerators with which we are dealing is controlled by a device commonly called a "cold control," located in an enclosure within the refrigerator cabinet. That instrument may be set at a desired temperature by the operation of a manually operated member connected with an element of the "cold control" switch. Prior to the granting of the patent, such member had been located in one of two places: (1) Inside the food storage compartment of the refrigerator cabinet, or (2) on the outer surface of the latter. Both of those arrangements were subject to serious objections, the former because the dampness and moisture inside the food storage compartment proved detrimental to the proper functioning of the device, and the latter because children might accidentally operate the control with serious results to the contents of the refrigerator.

Anderson's arrangement involved the placing of the manually operated member (hereinafter called the disc, for that, in fact, is what it was) in a new location. The "cold control" itself was placed in the machinery space below the food compartment. That was set by a disc, the edge of which, suitably marked with graduations, extended slightly through and above a horizontal plane between the lower (machinery) compartment and the upper (food storage) compartment. It could only be

reached when the access door was open, which eliminated objection No. 2. Because it was not located in the food compartment itself but rather in a horizontal plane separated therefrom by insulating material, objection No. 1 was also disposed of.

Anderson, in his statement of claims in the Patent Office says: "From the foregoing, it will be apparent that I have provided refrigeration apparatus of improved appearance, wherein the manually operated temperature control, while readily accessible for inspection and operation, is well protected from bumps or operation by unauthorized persons. Furthermore, the temperature control device is disposed in the machinery compartment, where problems of mounting or freezing of parts of the control, such as sometimes occur when the temperature control is disposed in the food storage compartment are overcome, while the disk 24 is disposed in an accessible position."

The first ground on which Crosley attacks this patent is that "the patent is invalid for complete anticipation by or want of invention over the prior art." As to this alleged want of invention, the District Court decided in favor of Westinghouse, saying, in its opinion [52 F.Supp. 900]: "Doubt as to whether the patent disclosed the dignity of invention has been resolved in favor of the owner of the patent for two reasons; first, the issue carries with it the presumption of validity, and second, Crosley promptly adopted the location of the manually controlled member after Westinghouse had disclosed it in its refrigerators."

As we read the record the elements in the Anderson arrangement had been part of the prior art. The only thing that Anderson did was to take those old elements and place them in different positions in and about the refrigerator cabinet. There was nothing new about the idea of a manually operated member governing the "cold control." The Wayman Patent 2,054,474 had that same idea, excepting that the member was there placed in an exposed position on the face of the cabinet. Anderson merely shifted the location of the device.

## II. Forsthoefel Patent, No. 2,166,630

The structure of a modern refrigerator cabinet involves an inner liner and an outer liner, spaced apart in proper relationship by various means. The opening between these two liners is closed by a so-

called "breaker strip," the function of which is to break the flow of heat between the two shells, thus contributing materially to the efficiency of the refrigerator. The Forsthoefel patent relates to a cabinet construction in which the breaker strip is removable. The strip is held in its proper position by means of springs and a grooved construction. Two of the objects of this type of structure are, in the words of the patent claims, " * * * to provide an improved means for mounting the breaker strips which extend between the edges of the inner and outer wall members at the door opening to close the space between said wall members," and " * * * to provide means for mounting the breaker strips more quickly, in order to reduce the cost of manufacture." The District Court fairly summarized this patent in its findings of fact where it is stated at page 887 of 52 F. Supp.:

"1. The Forsthoefel Patent 2,166,630, Claims 7 and 8 of which are in suit, relates to a refrigerator cabinet construction and particularly to an improved structure for mounting a heat breaker strip (which minimizes heat flow) between the inner and outer wall members of the cabinet and for retaining it in proper relationship to such wall members.

"2. The invention defined in the claims of said patent which are in suit is in the combination of the heat breaker strip, a two-way spring construction and the cabinet elements which cooperate therewith, and not in the breaker strip alone."

As seen, the important thing about the Forsthoefel apparatus is that the heat breaker strip can be readily attached to or removed from the refrigerator cabinet because of the groove-spring arrangement which holds the breaker strip in its proper position, covering the opening between the inner and outer linings of the refrigerator cabinet.

The most important patent in the prior art is Blood, No. 1,995,339, issued March 26, 1935. That invention related to a refrigerator box construction for facilitating the assembly and servicing of the refrigerating apparatus therein. In the discussion of the Anderson patent, supra, mention was made of the fact that the refrigerating machinery was located in a compartment separate from the food storage compartment. It is in the latter, of course, that the freezing unit is placed. In the Blood construction, certain refrigerant conduits and a control cable connecting the freezing unit with the refrigerating machinery passed through an opening in the door framing posts, between the inner and outer linings of the refrigerator cabinet. When repairs became necessary, it was desirable to remove this whole apparatus, including the conduits, to a repair shop without dismantling it in the owner's home. In order to attain that objective it was further desirable to have an easily removable strip closing the space between the inner and outer linings of the cabinet. It is true that this strip, called a "throat lining" in the Blood construction, is not spoken of as a heat breaker strip. The "throat lining" however, occupies approximately the same position in the Blood construction as the breaker strip in the Forsthoefel construction.

Perhaps the best way to outline the principle of the former is to quote the language of Blood's patent application, as follows:

" * * * a conduit channel is formed in the box framework, preferably, in the throat of the door opening, and this channel is normally covered by an easily removable throat lining which also serves to cover the edges of the inner or compartment lining and the outer casing.

"It is accordingly an object of this invention to provide an improved throat lining, and fastening means therefor, for the door frame or opening into a refrigerator compartment, the lining being arranged for ready removal to facilitate the removal or assembly of refrigerant and control conduits extending from a separate machinery compartment to a freezer or evaporator unit in the refrigerated compartment.

"Other and further important objects of this invention will be apparent from the disclosures in the specification and the accompanying drawing.

\* \* \* \* \* \*

"Since the channel is positioned in the door frame between the edges of the compartment lining and the outer casing, it is normally covered by throat lining or removable trim strips 24 which finish off the door frame or opening. These strips may be of wood or molded composition if desired but are preferably molded of bakelite or other composition material, the strips being finished either to harmonize or contrast with the balance of the cabinet. The throat lining laps over the edges 13 and 16 as shown in Figures 2 and 3, the difference between these figures residing in the bead

25 formed in the compartment lining 12 in Figure 2.

"The throat lining should be readily removable to facilitate access to the channel 18 for servicing, as by exposing the channel the freezer and compressor units can be removed together without disconnecting the connecting tubing with a consequent loss of some refrigerant and contamination of the remaining refrigerant by the admixture of air. In order to accomplish this result, the throat lining is mounted by means of a series of spring fasteners such for example as are shown in Figures 2 and 4. These fasteners comprise a spear or wedge shaped male member 26 which is riveted or otherwise mounted to the throat lining and is pushed between the curved prongs 27 of a spring socket or female member 28 mounted in a recess 29 in the door framing. It will, of course, be evident that the female member can be applied to the throat lining and the male member in the recess. Other forms of snap fasteners can also be used to retain the throat lining in place while rendering it readily detachable.

\* \* \* \* \* \*

"I am aware that many changes may be made and numerous details of construction may be varied through a wide range without departing from the principles of this invention, and we, therefore, do not purpose limiting the patent granted hereon otherwise than necessitated by the prior art.

\* \* \* \* \* \*

"I claim as follows:

\* \* \* \* \* \*

"5. A throat lining for refrigerator boxes comprising a box frame defining a compartment opening, a throat lining applied to said frame about said opening, and separable tensioned means for yieldingly retaining said throat lining in place the separate parts of said means being rigidly secured to the frame and the lining respectively."

### III. Yoxsimer Patent, 2,242,335

Like Forsthoefel, this patent relates to the mounting of the breaker strip in the refrigerator cabinet. Claim 3, which is the only claim in suit, reads as follows:

"What I claim is:

\* \* \* \* \* \*

"3. In cabinet construction, the combination of spaced-apart inner and outer sheet metal shells, a flange on each of said shells, said flanges being spaced apart and extending towards one another, said outer shell having a groove formed thereon and adjacent the flange thereof, a heat breaker of thin non-metallic material secured adjacent said spaced-apart flanges to bridge the space there-between, one edge of said breaker being positioned in said groove, a preformed strip of substantially S-shaped section having two oppositely-facing grooves therein, one of the grooves of said strip engaging the edge of the heat breaker opposite the edge engaged by the groove on the outer shell and the other groove of said strip engaging the edge of the flange on said inner shell in such a manner that said S-shaped strip may be slid onto said flange during assembly and is retained thereon without the use of nails, screws, or the like, said strip being substantially undeformed during and after the assembly of the refrigerator structure, widely spaced apart members adjacent the heat breaker for holding said inner and outer shells in spaced relationship, said members being the sole means adjacent the breaker strip for so holding said shells to minimize the flow of heat from one of said shells to the other through said members, and heat insulation between said shells."

As seen, the Yoxsimer construction contemplates a cabinet wherein the inner and outer sheet metal shells are provided with flanges extending toward one another, the outer shell having a groove formed thereon for receiving one edge of the breaker strip. The other edge of the breaker strip is arranged in one groove of a preformed S-shaped strip, the other groove of which receives the edge of the flange on the inner shelve. The S-shaped strip can be slid onto the inner flange during assembly. Its mounting does not involve the use of nails or the like, and it is substantially undeformed during and after the assembly of the refrigerator. The District Court held, with evident reluctance, that the patent was valid, saying at page 900 of 52 F.Supp.: "It must be confessed that certain of the patents cited as anticipations, particularly Connelly, No. 2,123,403, and Coughlin, No. 1,059,840, gave the court pause, although not quite to the extent of overcoming the presumption of validity incident to the issue of the patent."

In the Connelly construction, supra, one of the two retaining members for the breaker strip is provided with a resilient flange. One edge of the breaker strip is inserted in such member, thus forcing the

flange backward; the other edge of the breaker strip is then inserted in the second retaining member, and a deformable strip thereupon is then crimped or rolled in such a way as to firmly secure the breaker strip in its correct position. The following language from Connelly's patent application throws some light on the problem involved and his solution thereof:

"Breaker strips are generally secured on cabinets and walls to provide a smooth panel surface overlapping the edges of the panels and presenting a pleasing finished appearance. Previously known methods of and means for attaching breaker strips have been inconvenient to apply and unsatisfactory thereafter. Considerable extra labor was involved in drilling the breaker strips, and the walls and frames of the cabinets, doors and the like. The apertures thus provided admitted moisture and foreign matter and the smooth panel surfaces of the breaker strips were marred. Also the heads of screws and fastening members on the surfaces of the breaker strips presented an unpleasing appearance and interfered with polishing and cleaning.

"It is accordingly an object of my invention to provide a simple and convenient method of and means for assembling breaker strips on cabinets whereby the breaker strips may be quickly secured in place to present smooth unblemished panel surfaces free of fastening members.

"It is also an object of my invention to provide an improved breaker strip fastening arrangement on cabinets having panels thereon with their adjacent edges disposed in spaced relation, which comprises elongated retaining members secured along the spaced edges of the panels which are to be covered whereby the breaker strip to be covered whereby the breaker strip to be attached is conveniently secured by inserting one edge under a portion of a retaining member and snapping the other edge of the strip under a portion of the other retaining member.

"It is a further object of my invention to provide for such arrangements a breaker strip retaining member comprising an elongated cabinet abutting base having a projecting portion extending angularly from one edge thereof to simulate a bevel surface joining the edge of the breaker strip which is inserted in abutting engagement against a flexible flange projecting from the outer edge of the bevel wall toward the

base and serving to clamp the edge of the strip.

"Another object of my invention is to provide in such a breaker strip attaching arrangement, a pair of the elongated retaining members between which the edges of the breaker strip may be frictionally snapped whereby the panel surfaces of the breaker strip are unblemished and free from fastenings.

"A further object of my invention is to provide a breaker strip retaining member comprising an elongated cabinet abutting base having attaching points blanked therefrom, a bevel wall projecting angularly from one edge of the elongated base, a resilient flange on the outer edge of said bevel wall and projecting toward the base for resiliently gripping an edge of a breaker strip and a stop ledge projecting from the edge of said resilient flange for limiting its movement relative to the bevel wall.

"Another object of my invention is to provide in such an arrangement, the breaker strip retaining means comprising an elongated base having a deformable strip projecting therefrom for receiving and securing the edge of a breaker strip after its other edge has been inserted into a retaining member which may be of similar construction to any of those previously referred to."

The Coughlan construction calls for a *sliding panel* to close the opening between the inner and outer shells of a portable refrigerator. It was patented April 22, 1913. In the Coughlan structure, the space between the two shells was to be filled with ice, instead of the insulating material found therein in the modern household refrigerator. Nevertheless, the sliding panel of Coughlan is strikingly similar to the heat breaker strip of the refrigerator of today. The sliding panel arrangement is described in the language of the inventor as follows:

"As shown the sides and one of the ends of the outer casing have their free edges bent inwardly upon themselves as at 16 and said inbent edge portions are further bent to form guides 17. Both sides and both ends of the inner receptacle have their upper portions bent outwardly and downwardly upon themselves to form similar guides 18 adapted to coact with the guides 17 to receive the sliding closures 18', 19 and 20 as shown. The corner of the inner casing are connected to the walls of the outer casing by means of braces 21 which braces,

are preferably formed of sheet metal in the manner shown in Fig. 4 of the drawings by which means they form continuations of the guide ways for the closures 18', 19 and 20 and also form guide ways for a fourth closure 22. By this means the space between the upper edges of the inner and outer casings is completely closed by a plurality of independently removable closures while at the same time the inner casing is properly braced in place.

\* \* \* \* \* \*

"What I claim is:

"1. In a portable refrigerator, in combination, an outer rectangular casing having one upper end edge turned inwardly and outwardly to form a guide way and its side edges turned inwardly and outwardly to form guide ways, an inner casing having its walls equally spaced from the outer casing and its upper edges turned inwardly and outwardly, guide members extending from one upper end of the inner casing to the side of the outer casing and guide members extending from the other upper end of the inner casing to an end of the outer casing, plates having reduced ends upturned to form gripping portions and their sides slidable in the side grooves, a similar plate slidable in one pair of end grooves, a plate having a reduced upwardly bent grip portion and its ends slidable in the other pair of end grooves, \* \* \*"

### IV. Roberts Patent, 2,188,303

■ This patent refers to a method of testing refrigerators, whereby, while in full operation, they are moved on a conveyer belt through an air-conditioned room, the humidity and temperature of which can be controlled by the testing engineers so as to simulate any heat load which may be desired for the purposes of the test. All forty-seven claims of this patent were rejected by the primary examiner on the ground that there was no invention. Westinghouse then cancelled forty-one of the claims and took an appeal to the Board of Appeals of the Patent Office which allowed the remaining six. The following quotation from the patentee's brief before the Board of Appeals sets out more fully the nature of his claim:

"1. Moving completed and successive refrigerating mechanisms into a common space, with both their evaporators and condensers exposed to the temperature and humidity conditions prevailing in that space.

"2. Maintaining the space at such a temperature and humidity as will impose a severe and constant heat load upon the mechanisms, thus assuring reliability under exceptional rather than average conditions in the homes of users.

"3. Conveying the mechanisms through said atmosphere at a constant speed by means of a conveyor, and continuously operating the mechanisms while they are so conveyed.

"4. Providing a timed interval for determining the point on the conveyor or the time when the mechanisms have become sufficiently stabilized to permit accurate tests, thereby obtaining uniformity before initiating testing operations.

"5. Testing (a) refrigerant charge by frost line observation on the system, (b) capacity of the system by observing the position at which the cold control knob stops operation of the system as it is turned to higher temperature positions, and (c) head pressure by a suitable head pressure gauge, and

"6. Comparing these results with standard test charts and mechanisms which are known to be correct in all respects for the heat load maintained and the time which the mechanisms are subjected thereto."

The patents cited by Crosley as anticipations of Roberts include Coffin 1,638,111, which relates to the testing of tires in an air-conditioned room under controlled conditions of temperature and humidity; Koester 1,885,209, relating to the testing of paper in an air-conditioned room under controlled temperature and humidity conditions, and several others. Several publications are also cited in an effort to prove that the frost line test used in Roberts' method was well known long prior to the latter's patent.

As in the case of the Yoxsimer patent, supra, the District Court relied on the presumption of validity incident to the granting of a patent to sustain the Roberts patent, saying at page 902 of 52 F.Supp.: "The Primary Examiner rejected all of the 47 claims in the application before him. The patentee cancelled 41 of the claims, and appealed to the Board of Appeals of the Patent Office upon the remaining 6 claims. That body overruled the Examiner and allowed the patent. Upon the presumption of validity so created this court must rely, as it feels that the mass testing patents cit-

ed as anticipations do not to its satisfaction overthrow the presumption."

### V. Ashbaugh Patent, No. 2,079,238

█ This patent is for a method and apparatus of shipping refrigeration units uncrated. To accomplish that, Ashbaugh attached the refrigeration mechanisms to portable racks; the racks were then placed on pairs of rails properly spaced inside freight cars and secured in their proper places on those rails by restraining devices. Tiers of such rails were arranged on either side of the doors of the freight cars, permitting the shipment of many units in each car. Other freight, or a portable system of rails, could be placed or rolled into the space adjacent to the car door, thus permitting even more use of the available shipping space. Moreover, this method of shipment makes possible the unitary insertion of the various refrigeration elements into the cabinet openings after shipping.

Claims 2, 3, 4, 8, 9, 11 and 12 are here in suit. We quote just one of those claims, No. 2, to give a better idea of what Ashbaugh's method entailed: "2. In apparatus for transporting refrigerating machines or the like having elements which are flexibly connected and spaced apart, the combination of a vehicle having a plurality of supporting rails secured therein, a plurality of racks for respectively supporting the refrigerating machines to be transported, said spaced elements of the machines being secured to the racks in spaced relation, said racks and their supported elements being mounted in juxtaposed relation upon said rails, and means for maintaining the racks substantially in a fixed position on the rails, whereby movement of the racks along the rails is prevented."

Ten patents are cited by Crosley as being anticipations of Ashbaugh. Several of them refer to methods of shipping in which the articles to be shipped are held in rigid position through the use of racks and the like. None of them refers specifically to shipping a racked refrigerating system, though two, King 1,825,870 and Ploeger 1,838,041 show racked refrigerating units. The latter indicates a racked unit which is "detachably assembled as a unit with a refrigerator."

Crosley moreover insists that the patent is invalid because of Crosley's own prior knowledge and use. This contention is based upon the antecedent use by Crosley of "elephants" to transport refrigerating units from place to place within its plant. That use is covered by Stipulation No. 10 between the parties, from which we quote:

"The condenser, compressor and evaporator were mounted in spaced apart relationship to one another as shown, and connected to one another by flexible metallic conduits, some of these being marked 6. The unit as shown was mounted in the top of a refrigerator cabinet with the motor, compressor and condenser disposed in a compartment above the refrigerated storage compartment and the evaporator 5 disposed within the refrigerated storage compartment. The refrigerating mechanism was completely removable from the cabinet as shown in said sketch.

"In 1932 these units were moved about in the Crosley plant upon vehicles which were referred to by the Crosley employees as 'elephants.' Two of these 'elephants' are shown in photograph R on the attached page 11 of the Crosley 1932 catalog. Each consisted of an inverted V-frame mounted upon rollers and having five layers of parallel horizontal rails upon which the units were set in rows, as shown.

"Another view of a Crosley 'elephant' with refrigerating units mounted thereon is shown on page 16, Section II of the Crosley 1937 catalog, a copy of which is attached hereto. The 1937 'elephants' were mounted on rollers attached to overhead rails.

"These 'elephants' with the units mounted thereon, were used by Crosley in 1932 to move the units from point to point within the Crosley Plant and from one building to another. The units were mounted upon the 'elephants' at the assembly line and transported to drying ovens where the units were dried and they were then transported from the ovens to charging boards in another building where they were charged with refrigerant.

"Empty 'elephants' were brought back to the assembly line where they were reloaded with units and the above described procedure repeated. This practice was carried out continuously from 1932 to the time refrigerator production was suspended in 1942 by order of the War Production Board."

Even from the above brief outline the lack of invention in all five of the patents under discussion is apparent. In regard to Anderson, the principle of "cold-control" was known before that patent as was the

manually controlled member. It was also understood that a position for the latter either inside the food compartment or on the outside of the cabinet was open to serious objections. Nothing "somewhat above ordinary mechanical or engineering skill" was "distinctly shown." Atlantic Works v. Brady, 107 U.S. 192, 2 S.Ct. 225, 231, 27 L.Ed. 438. Anderson's "invention" is "no more ingenious than selecting the last piece to put into the last opening in a jig-saw puzzle. It is not invention." Sinclair & Carroll Co. v. Inter-Chemical Corporation, 325 U.S. 327, 65 S.Ct. 1143, 1147.

Little more can be said for the other four patents. They were "but the display of the expected skill of the calling" and involved "only the exercise of the ordinary faculties of reasoning upon the materials supplied by a special knowledge, and the facility of manipulation which results from its habitual and intelligent practice," and were "in no sense the creative work of that inventive faculty which it is the purpose of the constitution and the patent laws to encourage and reward." Hollister v. Benedict & Burnham Manufacturing Co., 113 U.S. 59, 5 S.Ct. 717, 724, 28 L.Ed. 901.

It is true that they represented improvements over the prior art. "But all improvement is not invention, and entitled to protection as such. Thus to entitle it, it must be the product of some exercise of the inventive faculties, and it must involve something more than what is obvious to persons skilled in the art to which it relates." Pearce v. Mulford, 102 U.S. 112, 118, 26 L.Ed. 93.

In Atlantic Works v. Brady, 107 U.S. 192, at page 200, 2 S.Ct. 225, at page 231, 27 L.Ed. 438, the Supreme Court said:

"To grant a single party a monopoly of every slight advance made, except where the exercise of invention somewhat above ordinary mechanical or engineering skill; is distinctly shown is unjust in principle and injurious in its consequences.

"The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the art. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to law suits and vexatious accountings for profits made in good faith."

The same Court held in Cuno Engineering Corporation v. Automatic Devices Corp., 314 U.S. 84, at pages 90, 91, 62 S.Ct. 37, at page 40, 86 L.Ed. 58:

"We may concede that the functions performed by Mead's combination were new and useful. But that does not necessarily make the device patentable. Under the statute, 35 U.S.C. § 31, 35 U.S.C.A. § 31, R.S. § 4886, the device must not only be 'new and useful,' it must also be an 'invention' or 'discovery.' Thompson v. Boisselier, 114 U.S. 1, 11, 5 S.Ct. 1042, 1047, 29 L.Ed. 76. Since Hotchkiss v. Greenwood, 11 How. 248, 267, 13 L.Ed. 683, decided in 1851, it has been recognized that if an improvement is to obtain the privileged position of a patent more ingenuity must be involved than the work of a mechanic skilled in the art. Hicks v. Kelsey, 18 Wall. 670, 21 L.Ed. 852; Slawson v. Grand Street P. P. & F. R. Co., 107 U.S. 649, 2 S.Ct. 663, 27 L.Ed. 576; Phillips v. Detroit, 111 U.S. 604, 4 S.Ct. 580, 28 L.Ed. 532; Morris v. McMillin, 112 U.S. 244, 5 S.Ct. 218, 28 L.Ed. 702; Saranac Automatic Machine Corp. v. Wirebounds Patents Co., 282 U.S. 704, 51 S.Ct. 232, 75 L.Ed. 634; Honolulu Oil Corp. v. Halliburton, 306 U.S. 550, 59 S.Ct. 662, 83 L.Ed. 980. 'Perfection of workmanship, however much it may increase the convenience, extend the use, or diminish expense, is not patentable.' Reckendorfer v. Faber, 92 U.S. 347, 356, 357, 23 L.Ed. 719. The principle of the Hotchkiss case applies to the adaptation or combination of old or well known devices for new uses. Phillips v. Detroit, supra; Concrete Appliances Co. v. Gomery, supra [269 U.S. 177, 46 S.Ct. 42, 70 L.Ed. 222]; Powers-Kennedy Contracting Corp. v. Concrete Mixing & Conveying Co., supra [282 U.S. 175, 51 S.Ct. 95, 75 L.Ed. 278]; Electric Cable Joint Co. v. Brooklyn Edison Co., 292 U.S.

69, 54 S.Ct. 586, 78 L.Ed. 1131; Altoona Publix Theatres v. American Tri-Ergon Corp., supra [294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005]; Textile Machine Works v. Louis Hirsch Textile Machines, Inc., 302 U.S. 490, 58 S.Ct. 291, 82 L.Ed. 382; Toledo Pressed Steel Co. v. Standard Parts, Inc., 307 U.S. 350, 59 S.Ct. 897, 83 L.Ed. 1334. That is to say, the new device, however useful it may be, must reveal the flash of creative genius not merely the skill of the calling. If it fails, it has not established its right to a private grant on the public domain.

\* . \* \* \* \* \*

"Strict application of that test is necessary lest in the constant demand for new appliances the heavy hand of tribute be laid on each slight technological advance in an art."

 While our conclusion of absence of invention as to the instant patents is decisive, it is worthy of note in passing that the District Court, in finding invention, relied heavily on the presumption of validity incident to the granting of a patent. This applies particularly to Anderson, Yoxsimer and Roberts, as indicated in the above quoted language from the Trial Court's opinion. Such a presumption does exist and to overcome it the party attacking the patent must produce clear and convincing proof. J. A. Mohr & Son v. Alliance Securities Co., 9 Cir., 14 F.2d 799, affirming D.C., 14 F.2d 793; Matteawan Mfg. Co. v. Emmons Bros. Co., 1 Cir., 253 F. 372. In Strong-Scott Mfg. Co. et al. v. Weller et al., 8 Cir., 112 F.2d 389, at page 394, Judge Sanborn stated the rule as follows: "The issuance of a patent is prima facie evidence of both novelty and utility. When one attacks a patent, he must make good his attack with reasonable clearness. The burden of proof is upon him, and every reasonable doubt will be resolved against him."

 The presumption must be given due weight, but it cannot be allowed to stand in the face of definitely contrary facts. In J. J. Warren Co. v. Rosenblatt, 7 Cir., 80 F. 540, at page 543, the Court said: "A certain presumption in favor of the validity of the patent arises from the action .of the patent office in granting the patent. In the consideration of the case we have allowed to this presumption its due weight, and we have assumed it to be true that no such article of such shape or size, or for the purpose designed, was before known, and that it is of superior utility. The presumption referred to is sometimes defined to mean that the patent itself is prima facie evidence of novelty and of invention, *but that presumption is probably a mere rule of evidence, which casts the burden of proof upon the alleged infringer.* This presumption cannot usurp the province of the court to declare what constitutes novelty. The court should give due consideration to the action of the patent office, but should not permit that action to control its deliberate judgment when· it is manifest that there is no invention. Hollister v. [Benedict & Burnham] Manufacturing Co., 113 U.S. 59–71, 5 S.Ct. 717 [28 L.Ed. 901.] If we entertained doubt touching the question of invention here, the presumption arising from the issuance of the patent would perhaps avail to resolve the doubt in favor of the patent. Entertaining no such doubt, *we cannot yield our judgment to a presumption which arises merely from the patent itself, and casts the burden of proof upon the infringing party.* The decree will be affirmed." (Italics ours.)

We think it clearly appears from the record that the changes in the prior art made by Anderson Re-issue 21,535, Forsthoefel 2,166,630, Yoxsimer 2,242,335, Ashbaugh 2,079,238 and Roberts 2,188,303 were such changes as would occur to those skilled in the particular art and that they were not patentable inventions. Therefore the District Court judgment in No. 8581 with reference to the above mentioned patents is reversed.